**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PARALLEL ENERGY LP, *et al.*[1] | § | Case No. 15-_____ (__) |
| | § | (Joint Administration Requested) |
| Debtors. | § | |
| | § | |

**MOTION OF THE DEBTORS (A) FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED
FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING THE
DEBTORS' LIMITED USE OF CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, AND (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SENIOR LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363
AND 364, AND (B) SCHEDULING A FINAL HEARING PURSUANT TO
BANKRUPTCY RULE 4001**

Parallel Energy LP ("Parallel LP") and Parallel Energy GP LLC ("Parallel GP"),

as debtors and debtors-in-possession (collectively, the "Debtors") file this *Motion for (A)*

*Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Secured*

*Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtors' Limited Use of*

*Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to*

*Prepetition Senior Lender Pursuant to 11 U.S.C. §§ 361, 362, 363 And 364, and*

*(B) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001* (the "Motion").  In

support of the Motion, the Debtors incorporate the *Declaration of Richard N. Miller in*

*Support of Voluntary Petitions and First Day Motions* (the "Miller Declaration")[2] filed

contemporaneously herewith.

---

[1] The Debtors are Parallel Energy LP and Parallel Energy GP LLC.
[2] All capitalized terms not expressly defined in the Motion shall have the same meaning as ascribed in the Miller Declaration.

518185 000003 16238836.18

**RELIEF REQUESTED**[3]

1.      By this Motion, the Debtors respectfully (a) request entry of an order substantially in the form attached as **Exhibit A** (the "Interim Order"), (i) authorizing Parallel LP (in its capacity as Post-Petition borrower, the "Borrower") to obtain senior secured post-petition financing (the "Post-Petition Facility") in an aggregate principal amount not to exceed $9.4 million, pursuant to section 364 of the Bankruptcy Code, and authorizing Parallel GP to unconditionally guaranty the Borrower's obligations under the Post-Petition Facility, from the Post-Petition Lender; (ii) authorizing use of cash collateral in connection therewith; (iii) authorizing the Debtors to execute, deliver and enter into the agreement regarding Post-Petition Facility and perform such other and further acts as may be required in connection with the Post-Petition Facility; (iv) as set forth in more detail below, granting certain security interests, liens and super-priority claims (including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to secure repayment of all obligations of the Debtors under and with respect to the Post-Petition Facility; (v) authorizing the Debtors' limited use of cash collateral; (vi) granting adequate protection to the Prepetition Lender, whose liens and security interests are being primed by the Post-Petition Facility; and (vii) modifying the automatic stay imposed under section 362 of the Bankruptcy Code; (b) request that an interim hearing on the Motion be held before the Court to consider entry of the Interim Order, which authorizes the Debtors to borrow or guarantee, as applicable, the Post-Petition Facility on an interim

_____

[3] Capitalized terms not defined in this section shall have the meanings ascribed to them below.

basis up to an aggregate principal amount not to exceed $5,400,000.00; and (c) request that the Court (i) schedule a final hearing (the "Final Hearing") on the Motion to consider entry of the Final Order authorizing the balance of the borrowings and guarantees, as applicable, on a final basis, and (ii) approve notice procedures with respect thereto.

## JURISDICTION

2.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

4.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the court would lack Article III jurisdiction to enter such final order of judgment absent consent of the parties.

5.      The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105, 361, 362, 363, 503, 507 and 522 as complemented by Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## PROCEDURAL BACKGROUND

6.      On November 9, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy

Code (the "Bankruptcy Code") thereby commencing their bankruptcy cases (collectively, the "Cases" or the "Bankruptcy Cases").

7.     Since the Petition Date, the Debtors have continued to operate their businesses as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.     The Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases.

## RELEVANT FACTUAL BACKGROUND

9.     Parallel Energy LP (the "LP") and Parallel Energy GP LLC (the "GP") are oil and gas businesses engaged in acquiring, owning, developing and operating long-life oil and natural gas properties in Texas and Oklahoma.

10.    The Debtors' oil and gas interests in Texas are located in the West Panhandle Field, the Cargray Area and the SE Roberts Area.  With approximately 400 operated active wells, the Texas region accounts for substantially all of the Debtors' interests and production of natural gas, natural gas liquids and condensate.  In Garfield and Jefferson Counties, Oklahoma, the Debtors own a small number of non-operated horizontal wells which account for approximately 1% of the Debtors' estimated total production.

11.    The Debtors were established under the laws of Delaware and their corporate offices are in Tulsa, Oklahoma.

12.    The GP is a Delaware limited liability company and the general partner of the LP, authorized to conduct, manage and direct all of the activities of the LP.  Parallel Energy Commercial Trust (the "Commercial Trust") owns the GP and serves as its sole

4

member.  The LP is a Delaware limited partnership owned 99.999% by the Commercial

Trust and .001 by the GP.  The Commercial Trust is an Alberta, Canada legal entity.

13.     The Commercial Trust and two other Canadian entities related to the

Debtors,  Parallel Energy Trust and Parallel Energy Inc., have filed applications seeking

relief under the *Companies' Creditors Arrangement Act* of Canada.

14.     As a result of continued low commodity prices, Parallel commenced a

formal review of strategic alternatives in April 2015.  Parallel considered, among other

things: (a) a sale of Parallel or substantially all of its assets, (b) a sale of one or more of

Parallel's significant assets, (c) a merger or other business combination, and (d)

alternative financing to reduce the amount of indebtedness under the Credit Facility or

otherwise to increase Parallel's available working capital.  Despite a robust effort to

identify a sale or refinancing transaction that could be completed outside of a chapter 11

case (and corresponding CCAA proceedings in Canada), no such transaction was

forthcoming.

15.     Building on this effort, in August 2015, Parallel initiated a marketing

effort designed to solicit bids that, potentially, might culminate in the identification of a

stalking horse bid for the Debtors' assets in contemplation of a sale and marketing

process that would be completed in chapter 11.

16.     As a result, Parallel and its professionals, in consultation with the Pre-

Petition Lenders, have collectively determined that the proposal submitted by Scout

Energy Group II, LP ("Scout" or the "Stalking Horse"), and the corresponding marketing

process to be completed as part of the Debtors' Chapter 11 Cases, would maximize the

financial return to the Debtors' creditor constituencies with minimal closing risk. Scout

has entered into a stalking horse purchase and sale agreement with LP.  As part of its bankruptcy process, the Debtors intend, among other things, to seek an order from the Bankruptcy Court approving Scout as the stalking horse bidder and a corresponding marketing process that would culminate in an auction designed to maximize the sales price for the Debtors' assets.

17.    Additional information regarding the Debtors' business and the events leading to the filing of these Bankruptcy Cases is contained in the Miller Declaration.

## SUMMARY OF THE DEBTORS' CAPITAL AND DEBT STRUCTURE

18.    As of the Petition Date, the Debtors have total outstanding debt obligations of approximately $164 million.  A detailed discussion of the Debtors' capital structure, including its various debt obligations, is set forth below.

19.    The Debtors and their non-debtor affiliates ("Parallel") have one secured creditor – a syndicate of lenders who provided financing pursuant to a credit agreement. Pursuant to a Credit Agreement dated April 21, 2011, as amended by those certain Amending Agreements (collectively, the "Pre-Petition Credit Agreement"), the Commercial Trust (by its trustee, PEI), as Canadian borrower, and LP, as U.S. borrower, entered into a credit facility with a lending syndicate comprised of Canadian Imperial Bank of Commerce ("CIBC"), Royal Bank of Canada ("RBC"), The Bank of Nova Scotia ("BNS") and Wells Fargo Bank, N.A. Canadian Branch ("Wells Fargo," and together with CIBC, RBC and BNS, the "Pre-Petition Lenders"), with CIBC acting as the Administrative Agent (the "Pre-Petition Agent")).

20.    The Pre-Petition Credit Agreement provides for two tranches of financing which rank *pari passu* to one another:

(a)  In Canada, the Pre-Petition Credit Agreement provides for a USD $10 million revolving operating term credit facility provided by CIBC as the lender to the Commercial Trust for general trust purposes (the "Operating Facility"); and

(b)  In the U.S., the Pre-Petition Credit Agreement provides for a USD $155 million revolving syndicated term credit facility provided by the Pre-Petition Lenders to LP for the acquisition, exploration, development and production of oil and gas properties in the U.S. (the "Syndicated Facility," and together with the Operating Facility, the "Pre-Petition Credit Facility").

21.  The Pre-Petition Credit Facility is subject to a borrowing base valuation of LP's oil and gas assets.

22.  The tranches of the Pre-Petition Credit Facility are secured by:

(c)  a CDN $250 million demand debenture April 21, 2011, governed by the laws of Alberta, issued by the Canadian Trusts, granting a first priority security interest to the Pre-Petition Lenders over all present and after-acquired personal property of the Canadian Trusts registered in Alberta and all other jurisdictions in which the Canadian Trusts carry on business;

(d)  Securities Pledge Agreement April 21, 2011, governed by the laws of Alberta, executed by the Commercial Trust, granting a pledge of all voting shares of the U.S. Parallel Entities (GP and LP) held by the Commercial Trust to the Pre-Petition Lenders;

(e)  a Security Agreement April 21, 2011, governed by the laws of Texas, executed by each of the U.S. Parallel Entities, granting a first priority security interest to the Pre-Petition Lenders over all present and after-acquired personal property of the U.S. Parallel Entities, including a pledge of any voting shares held by the U.S. Parallel Entities and a Uniform Commercial Code Financing Statement describing such personal property as collateral; and

(f)  a Mortgage April 21, 2011, governed by the laws of Texas, granted by LP, creating a first priority deed of trust lien over all the U.S. oil and gas properties to the Pre-Petition Lenders.

23.  In addition, each of the Parallel entities (except PEI) entered into Guarantee Agreements with the Pre-Petition Lenders dated April 21, 2011, along with multiple Consent Agreements dated November 4, 2011, April 12, 2012, June 25, 2012,

March 25, 2013, April 28, 2014 and April 27, 2015, respectively (collectively, the "Guarantee Agreements").  Pursuant to the Guarantee Agreements, each of the Parallel entities except PEI guaranteed the Pre-Petition Credit Facility.

24.    As of the date hereof, the full balance of the Syndicated Facility and the Operating Facility has been drawn.

25.    The Debtors and the Pre-Petition Lenders have entered into that certain Restructuring Support Agreement dated as of November [__], 2015 (the "Restructuring Support Agreement"), pursuant to which the Pre-Petition Lenders agreed to support the Debtors' restructuring as more fully set forth therein.

### THE DEBTORS' PROPOSED POST-PETITION FACILITY

26.    After significant arms'-length and good faith negotiations, the proposed post-petition lenders (collectively, the "Post-Petition Lender") set forth in the Credit Agreement attached as **Exhibit B** (the "DIP Credit Agreement") have agreed to make a post-petition loan (the "Post-Petition Facility") available to the Debtors under the terms and conditions of the DIP Credit Agreement and the Interim Order.

27.    The Debtors propose to borrow funds from the Post-Petition Lender for working capital and general corporate purposes in an amount not to exceed $5,400,000.00 (as set forth in the initial approved budget attached as **Exhibit C** (the "Initial Approved Budget")) following entry of the Interim Order and an additional amount not to exceed $4,000,000.00 upon entry of a final order regarding the relief requested herein (the "Final Order") (for an aggregate principal amount not to exceed

$9.4 million (the "Maximum Amount")). The material terms of the Post-Petition Facility as provided in the DIP Credit Agreement are summarized below:[4]

| Borrower: | Parallel LP |
|---|---|
| Guarantor: | Parallel GP |
| Agent: | Canadian Imperial Bank of Commerce, as Administrative Agent and Collateral Agent for the Lenders |
| **Use of Proceeds:**<br><br>**Interim Order at ¶ 2(g)**<br><br>**DIP Credit Agreement at §5.11** | The Borrower agrees that, until Payment in Full, the Borrower shall use the proceeds of the Loans only for the purposes specified in the recitals to this Agreement and in compliance with the Budget. The Borrower will not request any Credit Extension, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Credit Extension (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto. |
| **Commitments:**<br><br>**Interim Order at ¶ 2(c)**<br><br>**DIP Credit Agreement at §2.01** | (a) <u>Interim Order Loans</u>.  Subject to the terms and conditions set forth herein, each Lender agrees, severally and not jointly, to make an Interim Loan to the Borrower on the Closing Date in an amount equal to the Interim Order Commitment of such Lender.<br><br>(b) <u>Final Order Commitments</u>.  Subject to the terms and conditions set forth herein, each Lender agrees, severally and not jointly, to make a Final Loan to the Borrower on the Final Order Funding Date in an amount equal to the Final Order Commitment of such |

---

[4] This summary is qualified in its entirety by the provisions of the DIP Credit Agreement. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Capitalized terms not defined in this section shall have the meanings ascribed to them in the DIP Credit Agreement. All section references contained in this summary refer to sections in the DIP Credit Agreement.

Lender.

(c) The Borrower may make only one borrowing under the Interim Order Commitment and one borrowing under the Final Order Commitment. The borrowing under the Interim Order Commitment shall be on the Closing Date and the borrowing under the Final Order Commitment shall be on the Final Order Funding Date. All proceeds of the Interim Loans and the Final Loans shall be wired directly to the Loan Account upon receipt thereof by the Administrative Agent. All cash and Cash Equivalents received by any Loan Party prior to repayment in full of the Loans shall be deposited into the Loan Account. Amounts in the Loan Account will be disbursed from such account from time to time by the Administrative Agent, as set forth in Section 2.01(d), solely to fund the Cases and the business of the Debtors, subject to and in accordance with the Budget (subject to any variance permitted by Section 5.15), the Interim Order and the Final Order, as applicable. The Loan Account will receive the proceeds of draws made under the Credit Facilities and all other funds received by any Loan Party. Funds shall be withdrawn from the Loan Account only to fund the Operating Account, solely in order for the Borrower to make payments in accordance with the Budget, Interim Order and the Final Order, and only to the extent no Default or Event of Default has occurred and is continuing at the time of such withdrawal.

(d) The Borrower may deliver to the Administrative Agent a Withdrawal Request no later than 12:00 p.m. on any Variance Testing Date. Subject to Section 4.02, and subject to its receipt of a Withdrawal Request (and after a reasonable period of time for examining the contents thereof), the Administrative Agent shall transfer amounts held in the Loan Account (the "Pre-Funded Amounts") in an aggregate principal amount equal to the amount specified in such Withdrawal Request to the account of the Borrower specified in such Withdrawal Request solely to fund payments due and payable in accordance with the Budget, the Interim Order and the Final Order, the proceeds of which shall be deposited into the Operating Account.

| | |
|---|---|
| | (e) Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.   Subject to Section 2.06 and Section 2.07, all amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date.   Each Lender's Interim Order Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Interim Order Commitment on the Closing Date and each Lender's Final Order Commitment shall terminate immediately and without further action on the Final Order Funding Date after giving effect to the funding of such Lender's Final Order Commitment on the Final Order Funding Date. |
| **Procedure for Borrowings:**<br><br>**DIP Credit Agreement at §2.02** | (a)  The Borrower shall deliver to the Administrative Agent a fully executed Borrowing Notice no later than two Business Days in advance of the proposed Borrowing Date (or such shorter period as may be acceptable to the Administrative Agent).  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.02 (and the contents thereof), and of each Lender's portion of the requested borrowing.<br><br>(b) Upon satisfaction or waiver of the conditions precedent specified herein, each Lender shall make its Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Borrowing Date by wire transfer of same day funds in Dollars, at the principal office designated by the Administrative Agent.  Upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent shall deposit the proceeds of the Loans in the Loan Account and shall make the proceeds available to the Borrower on the applicable Borrowing Date subject to the requirements set forth in Section 2.01(c) hereof, by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from the Lenders to be credited to the Loan Account. |
| **Conditions Precedent:**<br><br>**Interim Order at ¶ 2(h)** | <u>Conditions to Initial Credit Extension.</u>  The obligation of each Lender to make the initial Credit Extension requested to be made by it hereunder is subject to the |

| | |
|---|---|
| **DIP Credit Agreement at § 4.01; §4.02** | satisfaction (or waiver), prior to or concurrently with the making of such Credit Extension, of each of the following conditions precedent:<br><br>(a) <u>Loan Documents</u>. The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of the Borrower, each Agent and each Lender, (ii) a Note, executed and delivered by the Borrower in favor of each Lender that has requested a Note, (iii) the Escrow Agreement, executed and delivered by a duly authorized officer of the Borrower, the Agent and each of the other signatories thereto; (iv) the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of the Borrower, GP Guarantor and the Agent and (v) each other Loan Document executed and delivered by a duly authorized officer of each party thereto.<br><br>(b) <u>Interim Order</u>.  The Bankruptcy Court shall have entered the Interim Order and it shall be in full force and effect and shall not have been reversed, modified, stayed or amended unless such reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Required Lenders in their respective sole discretion.<br><br>(c) <u>No Relief</u>.  No pleading or application seeking relief affecting the provision of the Credit Facilities shall have been filed in the Bankruptcy Court by any Debtor.<br><br>(d) <u>Personal Property Collateral</u>.  Each Loan Party shall have delivered to the Collateral Agent:<br><br>    (i)     evidence that each Loan Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including any amendments to the articles of incorporation or other constitutional documents of agreements of such Loan Party pursuant to which any restrictions or inhibitions relating to the enforcement of any Lien created by the Security Documents are removed) and authorized, made or caused to be made any other filing and recording required under any Security Document, and each UCC financing statement shall have been filed, registered or recorded or shall have been delivered to the Collateral Agent and shall be in proper form for filing, registration or |

recordation, and each of the Pledged Accounts shall be subject to a perfected first priority lien in favor of the Administrative Agent for the benefit of the Secured Parties; and

(ii)      the Collateral Agent shall have received (1) the certificates representing the shares of certificated Equity Interests pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power or other instrument of transfer for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, (2) an acknowledgement and consent, in form and substance reasonably satisfactory to the Administrative Agent, duly executed by any issuer of Equity Interests pledged pursuant to the Guarantee and Collateral Agreement that is not itself a party to the Guarantee and Collateral Agreement, and (3) each promissory note pledged pursuant to the Guarantee and Collateral Agreement duly executed (without recourse) in blank (or accompanied by an undated instrument of transfer executed in blank and reasonably satisfactory to the Collateral Agent) by the pledgor thereof.

(e) Fees and Expenses.  The Lenders, the Arranger and the Agents shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced at least two Business Days prior to the Closing Date, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, disbursements and other charges of counsel and other advisors) required to be reimbursed or paid under any Loan Document or under the Prepetition Credit Agreement.

(f) Cash Management Order; Other Orders.  The Cash Management Order entered by the Bankruptcy Court as of or around the date hereof shall be in full force and effect and has not been amended without the consent of the Administrative Agent and the Required Lenders in their respective sole discretion.

(g) Closing Certificate.  The Administrative Agent shall have received a certificate of the Borrower, dated the Closing Date, confirming satisfaction of the conditions set forth in Section 4.01(a) and Section 4.02(b).

518185 000003 16238836.18

(h) <u>Responsible Officer's Certificates</u>. The Administrative Agent shall have received with respect to the Borrower and each other Loan Party:

    (i)    copies of the Organizational Documents of such Loan Party (including each amendment thereto) certified as of a date reasonably near the Closing Date as being a true and complete copy thereof by the Secretary of State or other applicable Governmental Authority of the jurisdiction in which each such Loan Party is organized;

    (ii)    a certificate of a Responsible Officer of each Loan Party (or its general partner as applicable) dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the Organizational Documents of such Loan Party as in effect on the Closing Date, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors or similar governing body of such Loan Party (and, if applicable, any parent company of such Loan Party) approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the Transactions, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation, formation or organization, as applicable, of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to <u>clause (iv)</u> below and (D) as to the incumbency and specimen signature of each Person authorized to execute any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party;

    (iii)    a certificate of another officer as to the incumbency and specimen signature of the

Responsible Officer executing the certificate pursuant to clause (ii) above; and

(iv)    a copy of the certificate of good standing of such Loan Party from the Secretary of State or other applicable Governmental Authority of the jurisdiction in which each such Loan Party is organized (dated as of a date reasonably near the Closing Date).

(i) Prepetition Lender Consent.  In accordance with the provisions of the Prepetition Credit Agreement, the Prepetition Agent and the Prepetition Required Lenders shall have consented to the priming of the Prepetition Secured Parties' Liens under the Prepetition Credit Agreement and the Loan Documents under and as defined in the Prepetition Credit Agreement by the Liens in favor of the Collateral Agent for the benefit of the Secured Parties, and such consent shall be binding on all Prepetition Secured Parties. The Prepetition Agent and the Prepetition Required Lenders execution and delivery of the Restructuring Support Agreement shall be deemed satisfaction of this condition in Section 4.01(i).

(j) Bank Regulatory Information.  At least five Business Days prior to the Closing Date, the Agents and the Lenders shall have received all documentation and other information required by bank regulatory authorities or reasonably requested by any Agent or any Lender under or in respect of applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act, that was requested at least eight Business Days prior to the Closing Date.

(k) Reserved.

(l) Letter of Direction.  The Administrative Agent shall have received a funds flow memorandum and duly executed borrowing notice and letter of direction from the Borrower addressed to the Administrative Agent, on behalf of itself and Lenders, directing the disbursement on the Closing Date of the proceeds of the Loans made on such date.

(m) Environmental Matters.  The Administrative Agent shall be reasonably satisfied with the environmental

518185 000003 16238836.18

condition of the Oil and Gas Properties of the Borrower and its Subsidiaries, and shall have received a copy of any environmental site assessments in the possession or control of the Borrower or any of its Subsidiaries that was performed within the past three (3) years on any Oil and Gas Properties of the Borrower and its Subsidiaries.

(n) <u>No Litigation</u>.  There shall not exist any action, suit, investigation, litigation, proceeding, injunction, hearing or other legal or regulatory developments, pending or threatened in writing in any court or before any arbitrator or Governmental Authority that individually or in the aggregate materially impairs the Transactions, the financing thereof or any of the other transactions contemplated by the Loan Documents.

(o) <u>Budget</u>.  The Administrative Agent and the Lenders shall have received from the Debtors the Budget and such other information as may be requested by the Administrative Agent or the Lenders, in each case in form and substance satisfactory to the Administrative Agent and the Required Lenders;

(p) <u>Governmental Authorizations and Consents</u>.  Each Loan Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary in connection with the financing contemplated by the Loan Documents, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent;

(q) <u>CCAA Order</u>.  The Alberta Court of Queen's Bench shall have entered an initial order providing relief to Parallel Energy Trust, Parallel Energy Commercial Trust and Parallel Energy Inc. and approving a Canadian debtor-in-possession financing facility.

Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have consented to, approved or accepted or to be satisfied with, each Loan Document and each other document required thereunder to be consented to, approved by or acceptable or satisfactory to a Lender, unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing

518185 000003 16238836.18

Date specifying its objection thereto.

<u>Conditions to Each Credit Extension and Release of Pre-Funded Amounts.</u>  The obligation of each Lender to make any Credit Extension requested to be made by it hereunder, and each release of Pre-Funded Amounts to the Borrower from the Loan Account, in each case on any date, is subject to the satisfaction or waiver of the following conditions precedent:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the date of such Credit Extension or release of such Pre-Funded Amounts, as applicable, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); *provided* that any representation and warranty that is qualified by "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects.

(b)    <u>No Default</u>.  No Default or Event of Default shall exist or would result from such Credit Extension or release of such Pre-Funded Amounts, as applicable, or from the application of the proceeds thereof.

(c)    <u>Borrowing Notice</u>.  In the case of any request by the Borrower for any Credit Extension, the Administrative Agent shall have received a fully executed Borrowing Notice in accordance with Section 2.02(a).

(d)    <u>Withdrawal Request</u>.  In the case of any request by the Borrower to a release of any Pre-Funded Amounts, the Administrative Agent shall have received a Withdrawal Request with respect to such release in accordance with Section 2.01(d).

(e)    <u>Effectiveness of Orders</u>.    The Interim Order, the Final Order and the Cash Management Order, as the case may be, shall have been

518185 000003 16238836.18

entered by the Bankruptcy Court, shall be in full force and effect and shall not have been reversed, modified, stayed or amended unless such reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Required Lenders in their respective sole discretion.

(f) <u>Compliance with Orders</u>. The Debtors shall be in compliance in all material respects with the Interim Order, Final Order and the Cash Management Order, as the case may be.

(g) <u>Compliance with Budget</u>. Subject to Section 5.15, the Debtors shall be in compliance in all respects with the Budget and any Credit Extension or release of Pre-Funded Amounts (i) shall be in accordance with the Budget, (ii) the relevant Borrowing Notice or Withdrawal Request shall contain a certification by the Borrower that the withdrawal request pursuant thereto complies, and the application of the funds so withdrawn will comply, with the terms of this Agreement in all respects, and the Administrative Agent shall be entitled to conclusively rely on such certification, absent manifest error.

(h) <u>Payment of Fees and Expenses</u>. The Administrative Agent shall have received evidence of payment of the fees, expenses, and other consideration then due and payable under Section 2.05 and Section 9.05 (other than fees and expenses of counsel to the Lenders, the Arranger, and the Agents, which may be paid after any such Credit Extension or release of Pre-Funded Amounts in accordance with Section 9.05).

(i) <u>Restructuring Support Agreement</u>. The Restructuring Support Agreement shall be in full force and effect and shall not have been terminated without the consent of the Administrative Agent and the Required Lenders.

(j) <u>Additional Matters</u>. The Administrative Agent shall have received on or prior to the date of such requested Credit Extension or release of Pre-Funded Amounts, as applicable, such additional documents and information as any Lender, through the Administrative Agent, may reasonably request on or

18

<table>
<tr><td></td><td>prior to the date of the Notice of Borrowing or Withdrawal Request, as applicable.

Each delivery of a Borrowing Notice or Withdrawal Notice and the acceptance by the Borrower of the proceeds of such Credit Extension or release of any Pre-Funded Amounts, as applicable, shall constitute a representation and warranty by the Borrower that on the date of such Credit Extension or release of Pre-Funded Amounts, as the case may be (both immediately before and after giving effect to such Credit Extension or release of Pre-Funded Amounts and the application of the proceeds thereof), the conditions contained in this Section 4.02 have been satisfied. The Borrower shall provide such information as the Administrative Agent may reasonably request to confirm that the conditions in this Section 4.02 have been satisfied.</td></tr>
<tr><td>**Maturity Date:**

**DIP Credit Agreement at §1.01, §2.03(a)**</td><td>"Maturity Date" shall mean the earliest to occur of (i) February 4, 2016, (ii) 30 days after entry of the Interim Order, if the Final Order has not been entered by such 30th day, among other things, containing such additional protections reasonably required by the Required Lenders, with only such modifications thereto as are satisfactory in form and substance to the Administrative Agent and the Required Lenders, (iii) the effective date of a chapter 11 plan filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, and (iv) the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise; provided that, if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

The Borrower shall repay to the Lenders the aggregate principal amount of all Loans outstanding on the Maturity Date and shall be in an amount equal to the aggregate principal amount of all Loans outstanding on such date.</td></tr>
<tr><td>**Events of Default**

**DIP Credit Agreement at §7.01**</td><td>Events of Default. Each of the following events shall constitute an Event of Default:

(a) the Borrower or any Loan Party shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof, whether at the due date thereof</td></tr>
</table>

or at a fixed date for payment thereof or by acceleration thereof or otherwise or (ii) any interest on any Loan or any fee or other amount (other than an amount referred to in clause (i)) payable hereunder or under any other Loan Document within two Business Days after any such interest or other amount becomes due in accordance with the terms hereof or thereof; or

(b) any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document or in any document or certificate delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(c) (i) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.03(a) or Section 5.05(a) (with respect to the Borrower only), Section 5.01, Section 5.11, Section 5.19 or Article VI or in Section 4 of the Guarantee and Collateral Agreement; or (ii) an "Event of Default" under and as defined in any Mortgage shall exist and be continuing; or

(d) any Loan Party shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement or any other Loan Document (other than as provided in Section 7.01(a), Section 7.01(b) or Section 7.01(c)), and such failure continues unremedied or unwaived for a period of 30 days after the earlier of (i) the date an officer of such Loan Party becomes aware of such default and (ii) receipt by the Borrower of notice from the Administrative Agent or any Lender of such default; or

(e)     any Loan Party shall (A) fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness (except for any failure to pay any principal or interest not permitted to be paid under the Interim Order or the Final Order, as applicable), when and as the same shall become due and payable beyond any applicable grace period in respect thereof; or (B) fail to observe or perform any other term, covenant, agreement or condition

20

relating to any Material Indebtedness (except for any failure to observe or perform such other term, covenant, agreement or condition not permitted to be observed or performed under the Interim Order or Final Order, as applicable) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holders or beneficiaries of such Material Indebtedness (or a trustee or agent on behalf of such holders or beneficiaries) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer to purchase by the obligor; or

(f)      the Bankruptcy Court shall enter, or any Loan Party shall seek or support the entry of, any order providing for any of the following: (i) dismissal of any Case or conversion of any Case to a chapter 7 case; (ii) appointment of a chapter 11 trustee, a responsible officer or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in any Case; (iii) other than the Carve-Out, the granting of any superpriority claim or lien which is *pari passu* with or senior to the claims or Liens of the Agent and the Lenders in any Case; (iv) the entry of any order in any Case charging any of the Collateral under Section 552(b) of the Bankruptcy Code or, subject to the Final Order, Section 506(c) of the Bankruptcy Code, or the commencement of other actions by the Debtors, or the entry of any order, adverse to the rights and remedies of the Secured Parties under the Credit Facility, in their sole discretion without the consent of the Administrative Agent and the Required Lenders; (v) entry of an order by the Bankruptcy Court terminating the use of cash collateral; (vi) the entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against any assets of any Debtor or to permit other actions that individually or in the aggregate would have a material adverse effect on any Debtor or its estate; or

518185 000003 16238836.18

(vii) termination of the Debtors' exclusive periods to file and/or solicit acceptances to a plan of reorganization; or

(g) (i) any Loan Party adopts, maintains, contributes to, is required to contribute to, or otherwise incurs any liability (whether absolute or contingent and including, without limitation, any liability as a result of either Loan Party's relationship with any ERISA Affiliate) with respect to any Single Employer Plan, Multiemployer Plan or any employee benefit plan that is subject to the laws of any jurisdiction outside the United States of America; (ii) any Loan Party becomes a party to any collective bargaining agreement with any labor union, organization, group or association, or voluntarily recognizes, or negotiates a collective bargaining agreement or agrees to negotiate a collective bargaining agreement with any labor union, organization, group or association; or (iii) any Loan Party otherwise incurs any liability (whether absolute or contingent and including, without limitation, any liability as a result of either Loan Party's relationship with any ERISA Affiliate) pursuant to Title IV of ERISA; or

(h) one or more judgments shall be rendered against any Loan Party and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of any Group Member to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $50,000 or (ii) is for injunctive relief and could reasonably be expected to result in a Material Adverse Effect; or

(i) at any time after the execution and delivery thereof, (i) the guarantee contained in Section 8 of the Guarantee and Collateral Agreement for any reason other than Payment in Full shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Security Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms

518185 000003 16238836.18

hereof or thereof or Payment in Full) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Security Documents with the priority required by the relevant Security Document, in each case, for any reason other than (x) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (y) as a result of the Collateral Agent's failure to maintain possession of any stock certificates or other instruments delivered to it under the Security Documents, or (iii) any Loan Party shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien on any Collateral (other than, solely with respect to perfection, any Excluded Perfection Assets) purported to be covered by the Security Documents; or

(j)  any Change of Control shall occur; or

(k)  any Funded Debt (other than the Obligations) or any guarantees thereof shall cease for any reason to be validly subordinated to the Obligations as provided in the documentation governing such Funded Debt (other than the Obligations) or any Loan Party shall contest the subordination of any Funded Debt (other than the Obligations) or any guarantees thereof; or

(l)  failure of the Final Order to be entered within 30 days after the Petition Date; or

(m) failure of the Interim Order or Final Order to be in full force and effect, including by the entry of an order reversing, amending, supplementing, staying for any period, vacating or otherwise modifying, in a manner that is adverse to the Secured Parties in their sole discretion, without the prior consent of the Administrative Agent and the Required Lenders, in their respective sole discretion; or

(n)  failure of any Debtor to comply with the terms of the

Interim Order or Final Order; or

(o) the payment by any Loan Party (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any pre-petition indebtedness or payables (other than as provided in the Budget or as to certain other exceptions to be agreed by the Agent and the Required Lenders in their sole discretion); or

(p) the assertion (or support) by the Loan Parties of any investigation, claim or action against (x) the Agent, the Arranger, or any other Secured Party or (y) the Prepetition Secured Parties (other than, in the case of clause (y) only, a customary claim and lien investigation conducted by an official statutory committee for a period of no longer than 60 days from the date of such committee's formation or, if no such committee is appointed, by a party in interest granted standing for a period of no longer than 75 days from the Petition Date); or

(q) a sale of all or any substantial portion of the Debtors' assets except as approved by the Administrative Agent and the Required Lenders in their respective sole discretion; or

(r) cessation of work otherwise contemplated by the Budget adversely affecting material current or planned business operations; or

(s) any governmental or other authorization or consent necessary for the Loan Parties' performance under the Definitive Documentation shall be withdrawn or shall otherwise cease to be in full force and effect; or

(t) Reserved;

(u) actual, or assertion by the Debtors of, lack of legality, validity, enforceability or perfection of guarantees or liens in favor of DIP Secured Parties; or

(v) the filing of a chapter 11 plan of reorganization or liquidation without the written consent of the Administrative Agent and the Required Lenders, in their respective sole discretion; or

(w) the Borrower or any Loan Party shall suffer to exist

|  | any Lien on any asset of any Loan Party (other than Permitted Liens) that constitutes Collateral unless such Lien shall be expunged promptly; or |
|---|---|
|  | (x) the Restructuring Support Agreement is terminated pursuant to the terms thereof; or |
|  | (y) the Borrower or any Loan Party shall terminate the Asset Purchase Agreement without the prior written consent of the Administrative Agent and the Lenders. |
| **Remedies Upon Event of Default**<br><br>**Interim Order at ¶ 15**<br><br>**DIP Credit Agreement at §7.02** | If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders take any or all of the following actions:<br><br>(a) declare the commitment of each Lender to make Loans, whereupon such commitments and obligation shall be terminated;<br><br>(b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and<br><br>(c) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or at law or in equity;<br><br>*provided*, *however*, that upon the occurrence of any Event of Default described in Section 7.01(f), the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, without further act of the Administrative Agent or any Lender. |

518185 000003 16238836.18

| | |
|---|---|
| **Interest Rate and Payment Dates:**<br><br>**Interim Order at ¶ 2(f)**<br><br>**DIP Credit Agreement at §2.08** | Each Loan shall bear interest for each day on which it is outstanding at a rate per annum equal to the Applicable Margin. Automatically, after the occurrence and during the continuance of an Event of Default the Borrower shall pay interest on all amounts (whether or not past due) owing by it hereunder at a rate per annum at all times, after as well as before judgment, equal to the rate otherwise applicable to such Loan pursuant to this Section 2.08, as applicable, plus 2.00% per annum from the date of such Event of Default until such Event of Default is cured or waived. |
| **Fees:**<br><br>**Interim Order at ¶ 2(f)**<br><br>**DIP Credit Agreement at §2.05** | (a) The Borrower agrees to pay on the Maturity Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for the providing of such Lender's Loan, an arranger fee in an amount equal to 2.00% of the stated principal amount of such Lender's Loan, payable to such Lender from the proceeds of its Loan as and when funded on the Closing Date and the Final Order Funding Date. Such arranger fees shall be in all respects fully earned upon entry of the Interim Order, due and payable on the Maturity Date and non-refundable and non-creditable thereafter.<br><br>(b) The Borrower agrees to pay to the Administrative Agent (i) an annual administrative agent fee in an amount equal to $100,000, which fee shall be earned by, and payable to, CIBC annually in advance for so long as the Credit Facility remains outstanding with the first installment due on the Closing Date, and (ii) the fees in the amounts and on the dates from time to time agreed to in writing by the Borrower and the Administrative Agent. |
| **Covenant to Guarantee Obligation and Give Security:**<br><br>**Interim Order at ¶ 2(i)**<br><br>**DIP Credit Agreement at §5.12** | (a) If at any time following the entry of the Interim Order, the transaction pursuant to the Purchase and Sale Agreement shall have been abandoned or the Purchase and Sale Agreement shall have been terminated then not later than 30 days following such abandonment or termination:<br><br>    (i) The Collateral Agent shall have received Mortgages, duly executed by the Borrower and its Subsidiaries creating Liens prior and superior in right to |

any other Person (other than with respect to Liens expressly permitted by Section 6.02), on all of the Oil and Gas Properties of the Borrower and its Subsidiaries.

(ii) The Administrative Agent shall have received title information in form and substance reasonably satisfactory to the Collateral Agent setting forth the status of title to Oil and Gas Properties of the Borrower and its Subsidiaries.

(iii) The Administrative Agent shall have received an opinion of counsel (which counsel shall be reasonably satisfactory to the Administrative Agent) in each state in which a Mortgage is required with respect to the enforceability of such Mortgage to be recorded in such state and such other matters as the Administrative Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Administrative Agent.

(b) Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, Mortgages and deeds of trust) that may be required under applicable Requirements of Law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the Transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Security Documents.

(c) In the event that any Person becomes a Subsidiary of the Borrower or any other Loan Party, the Borrower shall, and shall cause each other such Person to (a) within 10 days after such event (or such longer period of time reasonably acceptable to the Collateral Agent), cause such Person referred to in clause (x) or (y), as applicable, to become a Guarantor and a Grantor under (and as defined in) the Guarantee and Collateral Agreement by executing and delivering to the Collateral Agent a counterpart agreement or supplement to the Guarantee and Collateral Agreement in accordance with its terms and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably

518185 000003 16238836.18

requested by Collateral Agent in order to cause the Collateral Agent, for the benefit of the Secured Parties, to have a Lien on all assets of such Person (other than Excluded Assets), which Lien shall (other than with respect to assets constituting Excluded Perfection Assets) be perfected and shall be of first priority (subject to in the case of all such assets, Permitted Liens, and subject and subordinate only to the Carve-Out (subject to the limitations set forth herein and in the Interim Order) and the Prepetition Senior Permitted Encumbrances) and shall deliver or cause to be delivered to the Administrative Agent and the Collateral Agent, items as are similar to those described in Section 4.01(d) and Section 4.01(h) hereof, and Section 4.2 of the Guarantee and Collateral Agreement.  With respect to each such Subsidiary of the Borrower or any other Loan Party, the Borrower shall, within 10 days of such event (or such longer period of time reasonably acceptable to the Administrative Agent and the Collateral Agent), send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of the Borrower and (ii) all of the data required to be set forth in Schedule 3.17(a) with respect to all Subsidiaries of the Borrower, and such written notice shall be deemed to supplement Schedule 3.17(a) for all purposes hereof.

(d) In the event that after the Final Order Funding Date (i) any Loan Party acquires any Oil and Gas Properties or (ii) any Person becomes a Subsidiary of the Borrower or any other Loan Party and such Person owns Oil and Gas Properties at such time, and such interest in such Oil and Gas Property has not otherwise been made subject to the Lien of the Security Documents in favor of Collateral Agent for the benefit of the Secured Parties, then the Borrower shall, or shall cause such Subsidiary to, within 10 days of such event (or such longer period of time reasonably acceptable to the Collateral Agent), take all such actions and execute and deliver, or cause to be executed and delivered, all such Mortgages, documents, instruments, agreements and certificates, including those which are similar to those described in Section 5.12(a) with respect to each such Oil and Gas Property that the Collateral Agent shall reasonably request to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid first-priority security interest (subject and subordinate only to the Carve-Out (subject to the limitations set forth herein and in the Interim

| | |
|---|---|
| | Order) and the Prepetition Senior Permitted Encumbrances) in such Oil and Gas Property and shall deliver to the Collateral Agent opinions and other items as are similar to those described in Section 5.12(a) with respect to such Oil and Gas Properties. In addition to the foregoing, the Borrower shall, at the request of the Collateral Agent, deliver, from time to time, to the Collateral Agent such title information and environmental information with respect to the Oil and Gas Properties as the Collateral Agent may request. |
| **Obligations as Administrative Superpriority Expense Claims:**<br><br>**Interim Order at ¶ 2(l)**<br><br>**DIP Credit Agreement at §3.19(c)** | Pursuant to Section 364(c)(1) of the Bankruptcy Code and the Interim Order or the Final Order, as applicable, all Obligations hereunder and all other obligations of the Loan Parties under the Loan Documents, on a joint and several basis, (i) constitute allowed superpriority administrative expense claims in the Cases having priority, subject only to the payment of the Carve-Out in accordance with the Interim Order, over all administrative expense claims, adequate protection and other diminution claims, and unsecured claims of any kind whatsoever against the Loan Parties, whether now existing or hereafter arising, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113, 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and (ii) are senior to the rights of the Loan Parties and any successor trustee or estate representative in the Cases or any subsequent proceeding or case under the Bankruptcy Code. |
| **Financial Covenants and Reporting:**<br><br>**Interim Order at ¶ 2(d)**<br><br>**DIP Credit Agreement at §5.01, 5.14-15** | _Financial Statements._ The Borrower hereby agrees that, until Payment in Full, the Borrower shall deliver to the Administrative Agent and each Lender:<br><br>(a) beginning on the first Wednesday following the Petition Date, and each Wednesday thereafter, by no later than 12:00 p.m. (prevailing Eastern time) on each such Wednesday, deliver or cause to be delivered to the Agent and the Lenders:<br><br>    (i) a written report summarizing the Loan Parties' |

actual cash flow ending on Friday of the prior week, as compared to the cash flow for such week as set forth in the Budget (the "Cash Flow Report"), each such report to be in a form and with such level of detail as shall be satisfactory to the Lenders, acting reasonably; and

(ii) a written report setting forth the Loan Parties' working capital position (including a summary of priority payables) ending on Friday of the prior week, such report to include all supporting ledgers, analysis and other information (including a transaction report from bank accounts in the Loan Parties' names), each such report to be in form and with such level of detail as shall be satisfactory to the Lenders, acting reasonably.

(b) as soon as available but in no event later than 12:00 p.m. (prevailing Eastern time) on the 30th day of each month following the Petition Date, deliver or cause to be delivered to the Agent and the Lenders an unaudited consolidated balance sheet of the Loan parties as at the end of the prior month and unaudited consolidated statements of income and changes in financial position of the Loan Parties prepared in accordance with IFRS consistently applied except for the accounting of the carrying value of the Loan Parties' fixed assets and for the provision of depletion, depreciation and amortization.

*Weekly Cash Flow Projections:* (i) On each Wednesday (or if such Wednesday is not a Business Day, the following Business Day) by 4:00 p.m., commencing on the Petition Date, deliver an updated, "rolling" 13-week cash flow projection for the period commencing from the end of the previous week through and including thirteen weeks thereafter (each, a "Proposed Budget"), which shall reflect the Borrower's good faith projections, reflect reversal of any timing variances set forth in any Variance Report, include a description of changes from the previously approved Proposed Budget and be in form and detail consistent with the initial Budget and subject to the approval of the Administrative Agent and the Required Lenders. The Proposed Budget shall also be delivered to the Administrative Agent and the Lenders hereunder by the Borrower; provided that unless and until the Administrative Agent and the Required Lenders have approved of such Proposed Budget, the Debtors shall still

be subject to and be governed by the terms of the Budget then in effect and neither the Administrative Agent nor the other Secured Parties shall have any obligation to fund to or make disbursements pursuant to any Proposed Budget not constituting the approved Budget. The Administrative Agent, at the direction of the Required Lenders, shall have two (2) Business Days following receipt of each Proposed Budget to approve or reject such Proposed Budget upon written notice to the Borrower; provided that any portion of a Proposed Budget that relates to periods covered by a previously approved Proposed Budget shall automatically be deemed approved to the extent that no changes have been made to the Proposed Budget for such periods; provided, further, that, for the avoidance of doubt, the Borrower, the Administrative Agent and the Required Lenders may nonetheless mutually agree to modify line items in a Proposed Budget for weeks that have been previously approved by the Administrative Agent and Required Lenders. Upon receipt of a notice of rejection, the Borrower shall, within 24 hours of receipt of such notice, engage in good faith negotiations with the Administrative Agent and Required Lenders in order to develop a Proposed Budget that is acceptable to the Administrative Agent and Required Lenders in their respective sole discretion (such revised Proposed Budget to be submitted within two (2) Business Days of the Borrower's receipt of a notice of rejection).

*Variance Report*

(a) On each Wednesday (or if such Wednesday is not a Business Day, the following Business Day) following the Petition Date, deliver to the Administrative Agent and the Lenders a Variance Report (such date, the "Variance Testing Date").

(b) The Loan Parties shall cause the Variance Report delivered on each Variance Testing Date to comply with the following: (A) the Loan Parties' total expenditures (excluding any legal or advisory fees incurred on behalf of the Agent and the Lenders paid before October 2, 2015) for the prior four week period shall not have exceeded 110% of the amount of total expenditures for such four week period as set forth in the Budget; (B) the Loan Parties' net cash receipts (equal to gross revenue

31

| | |
|---|---|
| | less production tax, royalties, processing costs, oxygen removal fee and NGPL transportation costs), on an aggregate basis, for such four week period were not less than 90% of the aggregate amount of cash receipts included in the Budget for such four week period; (C) in the event the cash receipts on an aggregate basis for the past four weeks is less than 90% of the Budget for the past four weeks, for reasons outside the control of the Loan Parties, the cash flow test set forth in (B) above shall not apply and, in the alternative, the average daily barrel of oil equivalent produced during the prior four week period will not be less than 6,350 for the calendar month of October 2015, 6,300 for the calendar month of November 2015, 6,250 for the calendar month of December 2015, 6,200 for the calendar month of January 2016, and 6,200 for the calendar month of February 2016 and for each month thereafter. |
| **Limitation on Capital Expenditures:**<br><br>**Interim Order at ¶ 2(d)**<br><br>**DIP Credit Agreement at §6.15** | The Borrower hereby agrees that, until Payment in Full, the Borrower shall not, and shall not permit any Subsidiary to, directly or indirectly, without the prior written consent of the Administrative Agent and the Required Lenders make, commit to make or permit any Capital Expenditures of the Borrower or any Subsidiary in the ordinary course of business for any fiscal year of the Borrower (or, for the fiscal year in which the Closing Date occurs, the period from the Closing Date to the end of such fiscal year) ending with the last day of any fiscal year to exceed the aggregate amount of $100,000 in any fiscal quarter. |
| **Creation of Security Interest; Valid Liens:**<br><br>**Interim Order at ¶ 2(i)**<br><br>**DIP Credit Agreement at §3.19(b)** | After giving effect to the Interim Order or the Final Order, the provisions of the Loan Documents and the Interim Order or the Final Order, as applicable, (i) are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected first priority priming and senior Liens on and security interests in all rights, title and interests in the Collateral subject and subordinate only to the Carve-Out (subject to the limitations set forth herein and in the Interim Order) and the Prepetition Senior Permitted Encumbrances and (ii) are enforceable against the Loan Parties. |

518185 000003 16238836.18

| | |
|---|---|
| **Asset Sales:**<br><br>**Interim Order at ¶ 2(d)**<br><br>**DIP Credit Agreement at §2.06(a)** | Immediately upon consummation of any Asset Sale or the release to the Borrower of any funds from the Escrow Account, the Borrower shall prepay the Loans in an aggregate amount equal to the Proceeds thereof and such Proceeds together with any other consideration therefor shall be delivered to the Administrative Agent for the benefit of the Lenders. |
| **Indemnification by the Borrower:**<br><br>**Interim Order at ¶ 20(b)**<br><br>**DIP Credit Agreement at §9.05(b)** | The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each other Agent each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs (including settlement costs), disbursements and out-of-pocket fees and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted or awarded against any Indemnitee in any way relating to or arising out of or in connection with or by reason of (i) any actual or prospective claim, litigation, investigation or proceeding in any way relating to, arising out of, in connection with or by reason of any of the following, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation or proceeding): (x) the execution, delivery, enforcement, performance or administration of any Loan Document or any other document delivered in connection with the transactions contemplated thereby or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or the consummation of the transactions contemplated thereby or (y) any Commitment, any Credit Extension or the use or proposed use of the proceeds thereof; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, fees and expenses arise from any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an agent or arranger or any similar role hereunder or under any other Loan Document and other than any |

<table>
<tr>
<td></td>
<td>claims arising out of any act or omission of the Borrower or any of its Subsidiaries); or (ii) any actual or alleged presence or release of Materials of Environmental Concern on or from any property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries (clauses (i) and (ii), collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of such Indemnitee and regardless of whether such Indemnitee is a party thereto, and whether or not any such claim, litigation, investigation or proceeding is brought by the Borrower, its equity holders, its affiliates, its creditors or any other Person.  This Section 9.05(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim. The indemnity provided for in this Section 9.05(b) shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, disbursements, fees or expenses (1) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (2) result from a claim brought by Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if Borrower or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a  court of competent jurisdiction.</td>
</tr>
</table>

28.     In accordance with Local Rule 4001-2, the Debtors highlight the following provisions of the Interim Order and the DIP Credit Agreement:

a)     **<u>Debtors' Stipulations</u>**.  Paragraph E and paragraph 6 of the Interim Order and Section 7.01(p) of the DIP Credit Agreement provide for certain stipulations by the Debtors regarding the claims, liens and collateral of the Pre-Petition Senior Lender.  However, these stipulations are subject to challenge periods that are consistent with the minimum periods contemplated by Local Rule 4001-2(a)(i)(B).

b) **506(c) Waivers**.  Paragraph 8 of the Interim Order and Section 1.01 of the DIP Credit Agreement provide that the Final Order shall include the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code that takes effect upon entry of the Final Order.  The section 506(c) waivers are discussed in detail below.

c) **Liens on Proceeds of Certain Causes of Action**. Paragraph 2(i) of the Interim Order and Section 5.12(d) of the DIP Credit Agreement (with further details in the Security Agreement) provide for liens on the Post-Petition Collateral, which includes the proceeds of causes of action under section 549 of the Bankruptcy Code.

d) **Professional Fee Carve-Out**.  Paragraph 7 of the Interim Order and Section 1.01 of the DIP Credit Agreement provide for a Post-Default Carve-Out Cap but does not stipulate any disparate treatment.

e) **Priming of Prepetition Liens**.  Paragraph 4(iv) of the Interim Order and Section 4.01(i) of the DIP Credit Agreement provide that the liens securing the Post-Petition Obligations will be senior to and prime the Primed Liens securing the obligations of the Prepetition Senior Lender.   However, the Prepetition Senior Lender shall have consented to such priming, a condition precedent to the Loan.

f) **"Equities of the Case" Waiver**.  Paragraphs I and 4(i) of the Interim Order and Section 7.01(f) of the DIP Credit Agreement provide that the seeking or entry of an order under section 552(b) of the Bankruptcy Code  shall be considered an event of default.[5]

## BASIS FOR RELIEF REQUESTED

### A.     Approval Under Section 364(a) of the Bankruptcy Code

29.     The Debtors propose to obtain financing under the Post-Petition Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining post-petition credit under Section 364 of the Bankruptcy Code is a finding, made after notice and a hearing,

---

[5] Section 552(b) of the Bankruptcy Code applies to security agreements entered into by the Debtors before the commencement of the case.  The liens securing the Post-Petition Obligations are being granted after the Petition Date pursuant to the Interim Order, and the Debtors submit that section 552(b) is inapplicable to the Post-Petition Facility.

that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] . . ."  11 U.S.C. § 364(c).  Financing pursuant to section 364(c) of the Bankruptcy Code is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.),* 250 F.3d 955, 957 (5th Cir. 2001).

30.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364 of the Bankruptcy Code.  Specifically, courts look to whether:

> (a)    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.* by allowing a lender only an administrative claim;

> (b)    the credit transaction is necessary to preserve the assets of the estate; and

> (c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37–39; *see also In re St. Mary Hospital*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Babcock & Wilcox Co.*, 250 F.3d at 957.  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (finding that

section 364 "does not require the debtor to seek alternate financing from every possible lender").

31.    The Debtors have an urgent need for cash to continue their operations and preserve the value of their assets as a going concern.  While the Debtors have negotiated a proposed sale to Scout Energy Group II LLC ("Scout") (subject to higher and better offers), the Debtors have no unencumbered cash.  As a result, new borrowings are essential to preserve the Debtors' value pending the sale.  Absent such borrowings, the Debtors would be unable to continue their businesses, thus imperiling their going concern value and ability to accomplish the sale to Scout.  As a result, obtaining credit is necessary.

32.    After assessing the Debtors' financial condition, their capital structure and the absence of any unencumbered assets, the Debtors do not believe they would be able to obtain cash on an unsecured basis.  In fact, the Debtors have attempted for the past several weeks to solicit additional financing or capital infusions, including new debt or equity financing, with no success.  Currently, the Post-Petition Lender is the only party that offered to provide the Debtors with post-petition financing and is only willing to lend to the Debtors on a senior secured basis.

33.    Finally, given the Debtors' financial condition and performance and existing capital structure, the Debtors believe the terms of the Post-Petition Facility are fair, reasonable and adequate.  First, the Post-Petition Facility allows the Debtors to borrow in accordance with the Initial Approved Budget up to $5,400,000.00 on an interim basis and up to an aggregate of $9,400,000.00 on a final basis.  The Debtors reasonably believe that these amounts will allow them to continue their operations

pending the closing of a sale.  Second, the Debtors believe that the financial terms of the Post-Petition Facility are reasonable for borrowings by a distressed company, including after taking into account the Debtors' prepetition capital structure and financing terms in the period leading up to its chapter 11 filing.  Third, the other terms of the Post-Petition Facility, including the protections provided to the Post-Petition Lender to secure repayment of the Post-Petition Obligations are consistent with provisions included in other secured debtor-in-possession financing facilities.  Finally, the Post-Petition Facility was negotiated between the Debtors and the Post-Petition Lender at arm's-length with the parties represented by counsel.

**B.    Approval of Priming Liens and Adequate Protection Under Section 364(d)**

34.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of Post-Petition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

(a)    the trustee is unable to obtain credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).  Consent by a secured creditor to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122

(N.D. Ga. 1989) ("by tacitly consenting to the super-priority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

35.    The Bankruptcy Code does not explicitly define "adequate protection." Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under sections 362, 363 or 364 of the Bankruptcy Code:

> (a)    requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the  . . . use . . . under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (b)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . or grant results in a decrease in the value of such entity's interest in such property; or
>
> (c)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *See In re Becker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (finding that by not defining "adequate protection," the statute confers "flexibility" upon courts to shape relief "as will result in the realization by the protected entity of the value of its interest in the property involved").  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  *In re Becker Indus. Corp.*, 58 B.R. at 736.

36.     Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under sections 361, 363 and 364 of the Bankruptcy Code.  However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." *See* 11 U.S.C. § 361.  Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Bank of New England v. BWL, Inc.*, 121 B.R. 413, 418 (D. Me. 1990) (same); *In re Becker Indus. Corp.*, 58 B.R. at 736 (focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

37.     As an initial matter, the adequate protection provided to the Pre-Petition Senior Lender has been consented to by the Pre-Petition Senior Lender, thereby satisfying the requirements of section 364(d).  *See Anchor Savs. Bank*, 99 B.R. at 122. Nonetheless, the Debtors submit that the adequate protection provided under the proposed Interim Order as described above is sufficient and appropriate in these cases. Indeed the continued operation of the Debtors' businesses, which will be made possible by the proceeds from the Post-Petition Facility, will allow the Debtors to preserve the going concern value of their business, thereby preserving the value of the Pre-Petition Senior Lender's collateral against the alternative -- a liquidation of the Debtors' assets.

**C.**    **Authorization and Approval of Payment of Pre-Petition Senior Obligations**

38.    The Debtors' agreement to the payment of the amounts due and owing to the Pre-Petition Lenders as a result of extensions of credit under the Pre-Petition Credit Facility (the "Prepetition Senior Obligations") should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code.   Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."   11 U.S.C. § 105(a).

39.    The proposed use, sale or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification.   *See In re Montgomery Ward*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions.").   Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations.   *See, e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property).   Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986).

40.     Paying the Pre-Petition Senior Obligations from the Post-Petition Facility proceeds is supported by sound business judgment as those are negotiated provisions of, and will allow the Debtors to obtain, the Post-Petition Facility.  As noted above, the Debtors were unable to obtain consent to use cash collateral, had no unencumbered cash as of the Petition Date and received no alternative Post-Petition financing proposals. These payments were requirements to the Pre-Petition Senior Lender consenting to the priming of the Pre-Petition Senior Lender's liens and the use of the Pre-Petition Senior Lender's cash collateral during these cases, as well as the Post-Petition Lender's willingness to lend.  Here, the Post-Petition Facility is necessary and is the Debtors' only way to preserve their going concern value and maximize returns for their stakeholders through a sale.  As a result, it is appropriate to permit the Debtors to pay the Pre-Petition Senior Obligations.

**D.      Use of Cash Collateral**

41.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[6]  Section 363 of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

42.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use

---

[6] Pursuant to section 1107 of the Bankruptcy Code, a debtor-in-possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. *See* 11 U.S.C. § 1107(a).

518185 000003 16238836.18

property of the estate in the ordinary course set forth in section 363 of the Bankruptcy

Code. Specifically, a trustee or debtor in possession may not use, sell, or lease "cash

collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

### E.     The Section 506(c) Waivers Should be Approved.

43.     The Court should approve the Debtors' waiver of any right to surcharge

under section 506(c). Such waivers and provisions are standard and customary under

financings between sophisticated parties. As one court noted in discussing the later

enforceability of such waivers, "the Trustee and Debtors-In-Possession in this case had

significant interests in asserting claims under § 506(c) and have made use of their rights

against the Lender under § 506(c) by waiving them in exchange for concessions to the

estates (including a substantial carve-out for the benefit of administrative creditors)." *In*

*re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see also In*

*re Nutri/System of Florida Assocs.* 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor

had waived § 506(c) rights in obtaining debtor in possession financing); *In re Telesphere*

*Communications, Inc.*, 179 B.R. 544, 549 (Bankr. N.D. Ill. 1994) (approving settlement

between debtor and certain lenders wherein debtor waived certain rights -- including

506(c) rights -- against the lenders in exchange for valuable consideration).

44.     The waiver of surcharge rights is particularly appropriate where, as here, it

is tied to the benefit to be received from both the post-petition funding being provided by

the Post-Petition Lender (which is receiving an immediate waiver) and the Carve-Out (which applies to the Post-Petition Lender's collateral and the collateral of the Pre-Petition Senior Lender, who only receives a waiver under the Final Order).  In other words, the Debtors have waived the uncertainty of surcharge rights in exchange for immediate liquidity from the Post-Petition Lender and the valuable and predictable rights granted to the Debtors' other estate professionals under the Carve-Out.  *See In re Lunan Family Restaurants Ltd. P'ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (*citing In re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984) and *New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)*, 112 B.R. 811, 815 (E.D. La. 1990), *rev'd on other grounds sub nom.*, *In re Delta Towers*, 924 F.2d 74 (5th Cir. 1991).

F.      **Modification of Automatic Stay**

45.     The Post-Petition Facility contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the Interim Order and Final Order and, upon the occurrence of the Termination Date, to exercise all rights and remedies in the Interim Order subject to the requirement that the parties shall use best efforts to schedule and attend a hearing before the Court to determine solely whether a Termination Date has occurred within three (3) days of providing notice that a Termination Date has occurred.  Provisions of this kind are standard in debtor in possession financing and are reasonable under the circumstances.

**G.**     **Interim Approval Should be Granted.**

46.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

47.     The Debtors request that the Court immediately hold and conduct the Interim Hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to borrow an amount sufficient to fund operating expenses and to use cash collateral.  This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

48.     Pending entry of the Final Order, the Debtors will require $5,400,000.00 in available financing to provide for the working capital needs of the Debtors (as set forth in the Initial Approved Budget).  Such interim availability will avoid a disruption in the Debtors' operations pending the Final Hearing and will provide the Debtors' customers, vendors and employees with the level of confidence necessary to continue operating.

## REQUEST FOR INTERIM AND FINAL HEARINGS

49.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and the Debtors should ordinarily schedule a hearing to

consider the Final Order at least seven (7) days after the organizational meeting of the creditors' committee. The Debtors shall, within forty-eight (48) hours of the entry of the Interim Order by the Court, serve by first-class mail, a copy of the Interim Order and a notice of the Final Hearing (the "<u>Final Hearing Notice</u>") to consider entry of the Final Order on the date established by the Court.

50.     Any party in interest objecting to the relief sought at the Final Hearing shall file and serve objections, which objections shall: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; and (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware no later than seven (7) business days before the Final Hearing and served upon the following parties so as to be received no later than seven (7) business days before the Final Hearing: (i) proposed counsel for the Debtors: Thompson & Knight LLP, 1722 Routh Street, Suite 1500, Dallas, TX 75201 (Attn: David M. Bennett, Esq.) and Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, DE 19801 (Attn: Neil B. Glassman, Esq., GianClaudio Finizio, Esq.); and (ii) counsel for the Lenders: Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834 (Attn: Mitchell A. Seider, Esq. and Annemarie V. Reilly, Esq.).

51.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion. Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

<u>**CONSENT TO JURISDICTION**</u>

52.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court

would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

53.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty-five (25) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (c) the Debtors' pre-petition and post-petition lenders; (d) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (e) all financial institutions at which the Debtors maintain deposit accounts; (f) the local office for the Internal Revenue Service; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

54.     No previous request for relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request (a) that the Court enter an order, substantially in the form attached as **Exhibit A** granting the relief requested herein; and (b) such other and further relief to the Debtors as the Court may deem proper.

Dated: November 9, 2015
      Wilmington, DE

BAYARD, P.A.

*/s/ GianClaudio Finizio*
Neil B. Glassman (No. 2087)
GianClaudio Finizio (No. 4253)
Evan T. Miller (No. 5364)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Tel: (302) 655-5000
Fax: (302) 658-6395
E-mail: nglassman@bayardlaw.com
      gfinizio@bayardlaw.com
      emiller@bayardlaw.com

and

THOMPSON & KNIGHT LLP
Demetra L. Liggins (*pro hac vice pending*)
Three Allen Center
333 Clay Street, Suite 3300
Houston, TX 77002
Tel: (713) 951-5884
Fax: (832) 397-8052
E-mail: Demetra.Liggins@tklaw.com

THOMPSON & KNIGHT LLP
David M. Bennett (*pro hac vice pending*)
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201-2533
Tel: (214) 969-1700
Fax: (214) 969-1751
E-mail: David.Bennett@tklaw.com

*Proposed Counsel for the Debtors*